## WILLIAM C. MORGAN v. WILLIAM M. STEARNS, AND G. H. & J. M. WEEKS AND JACOB EVANS, TRUSTEES.

### *Partnership. Homestead.*

The essential condition of a homestead right and interest, is ownership and occupancy by the husband and family, and the statute applies to an equitable as well as legal ownership; an incumbered as well as unincumbered estate.

The homestead interest to the amount of $500 being exempt from attachment except as to debts contracted prior to its acquisition, and this exemption being for the benefit of the family as well as of the husband and father, which interest could not be conveyed unless the wife joined in its conveyance, it is *held* that its value on a sale may be set apart and secured to the wife, irrespective of the rights of creditors whose claims accrued subsequent to the acquisition of such homestead.

A purchaser of chattels in good faith can not be held as trustee of the vendor on the ground that the latter had an illegal purpose in making the sale.

The items disallowed by the referee in this case *held* properly disallowed on the ground that the facts reported do not show a co-partnership existing between the plaintiff and defendant when the items accrued.

ASTUMPSIT, heard upon report of referee and commissioner, June term, 1868, Caledonia county, STEELE, J., presiding.

The court rendered judgment, *pro forma*, that the principal defendant, Stearns, is liable for the $414.22, mentioned in the report of referee, and interest. Judgment that G. H. and J. M. Weeks, trustees, be discharged with their cost, and that the claimant, Jacob Evans, hold the funds in his hands. Trustee Evans adjudged liable for the price of four sheep, mentioned in commissioner's report, taken by said Evans at $20, in November 1865, and interest.

The plaintiff excepted to the disallowance of the two last items in his account by the referee, as found, being the amount paid G. C. Cahoon on judgment; also excepted to the judgment discharging the trustee Weeks, and also to the judgment not holding the trustee Evans liable for the mow of hay, $60, and the difference in sheep, $10.

The following is the commissioner's report:

" It appeared in evidence that Wm. C. Morgan, the plaintiff, claimed to have a demand of twelve hundred dollars, against Wm. M. Stearns, the defendant, for his share of the expenses of a certain law suit, in which the plaintiff claims the defendant was jointly interested with himself.

" It also appeared that, Jacob Evans, trustee, knew that Morgan held such demand, which he claimed to be legal and just, and knew also that Stearns, the defendant, denied its legality and justice, and refused to pay it.

" On the 16th day of February, 1865, G. H. and J. M. Weeks, trustees, bought of Stearns, the defendant, a farm in the town of Victory, for which they paid the sum of $2050. The record title of said farm was in a brother of the defendant, one Benjamin Stearns, and one E. W. Spaulding, though the brother had in fact only a claim on the farm for a specific sum of money.

" The defendant was indebted to the Weeks, in the sum of about $800, to secure which they purchased the farm. They paid the defendant's brother and Spaulding about $700 in liquidation of their claims, and received from them deeds of the land.

" It had been agreed that the $800 due the Weeks, was to be regarded as part payment for the farm, and that on the receipt of the balance of the purchase money, Stearns and his wife were to quitclaim the farm to the Weeks. When the writings came to be executed, the defendant's wife refused to sign the deed unless she could have secured to her the value of the homestead.

" In accordance with the agreement of the parties, the Weeks executed their note for $500, payable to the wife, Susan Stearns, or order, on demand, with interest annually. This note was given for the true balance of the whole purchase money, after deducting the debt due them and the amount they had paid to clear the incumbrances on the farm, and was a *bona fide* transaction designed to secure the value of the homestead to the wife of Stearns.

" After the execution of the note and before the service of the process, trustee Evans notified the Weeks that he had purchased the note, and that they must pay it to him. He, Evans, paid the full value of the note. ' The next day after the note was executed, Stearns asked the Weeks to pay it ; but they did not pay it.

\* \* \* \* \* \* \* \* \* \*

" At the time of the trade, Weeks said to Evans, Stearns is afraid they will trustee him on some of those old law suits, but I can't see any possible way that that note can be reached, it being given for the homestead. It does not distinctly appear whether this applied alone to some claims of Bartlett and Cahoon, for counsel in the law suit already mentioned, or whether it was designed also to include the old claims of Morgan. The understanding at the time was that these claims of Bartlett and Cahoon should be paid.

" At the time of the delivery of the quitclaim deed, it was distinctly understood that the five hundred dollars was to be set

apart for the wife, and the note was made to her in accordance with this understanding. The note was delivered to Stearns, and the money for the purchase of the note paid to him, by Evans, the wife afterwards ratifying the trade by her endorsement.

" On the day of the trade, Evans came out with Stearns, having no suitable team of his own. They were together at Weeks' store in and out several times, both on the day of the trade and the day following. Evans had business of his own to transact at Lyndon, on Thursday, the day of the trade.

" The defendant had lived on the farm sold some ten or twelve years.

" Your commissioner finds that Evans purchased the note with full knowledge that Stearns refused to pay Morgan's claim for indemnity for expenses incurred in the old law suit, and that he was intending to leave the State in two weeks. Also that he knew Stearns wished to sell it because he feared it would be trusteed, though Weeks at the time, and in Evans' presence assured him that in his opinion it could not be held for Stearns' debts, being given for the homestead. The defendant claims that this note can not be held for attachment, it being given for the homestead. The plaintiff claims that Stearns had no homestead in said farm since he had no record title to it.

" Your commissioner further finds that Evans assisted in the general management of Stearns' affairs so far as the disposing of his property and gathering together its proceeds were concerned, and seems to have been regarded somewhat in the light of a confidential friend. If the court rule that the said note was not the property of the wife, as against Stearns' creditors, I find trustees, G. H. and J. M. Weeks, should be held for said note.

" But if the court find that Stearns had a homestead interest in said place, and that the note was the property of Mrs. Stearns, as against Stearns' creditors, and that the knowledge of Evans that Stearns did not intend to pay Morgan's old claim, the validity of which he denied, does not render the purchase of the note by Evans fraudulent, then I find that the Weeks should be discharged as trustees, and that said Evans hold the note as claimant.

" With reference to the purchase of the note, your commissioner further finds that Evans knew, at the time of its purchase, that Morgan had agreed with Stearns to go home with him, and have a settlement of their affairs.

" Morgan and Stearns were brothers-in-law, and have always been on terms of intimacy and friendliness up to the time of Stearns' departure.   *    *    *    *    *    *    *

" In February, Evans thinks the third day, he bought of Stearns a mow of hay for which he agreed to pay $60. Two thirds of this hay was not delivered till after Stearns left. At the same time he exchanged two sheep for three, and was to pay the difference of $10. These three sheep, which he got by exchange, were taken away after Stearns left. But all the property which he had bought of Stearns had been removed before the service of the trustee process.

" This property was paid for on Saturday night, prior to Stearns' leaving on Monday. Evans knew at the time he paid for the property that Stearns was soon to leave for the West, and that he did not intend to pay Morgan's claim for indemnity for the expenses of the law suit.

" The plaintiff claims to charge Evans as trustee of said property. Whether he is so chargeable is left for the decision of the court."

The two items of the plaintiff's specifications, which were disallowed by the referee to whom the case was referred, were as follows :

1865, Cash paid G. C. Cahoon as allowed by auditor.... $551.06
          one half of which is.............. $275.53
     Paid by trustee on same suit............     270.00
          one half of which is.............. 135.00
     Interest on two items................. 55.04

In respect to the relation existing between the parties when said items accrued, and upon which the defendant's liability turned, and also in respect to the items which the referee allowed, the referee reported as follows :

" Stearns married Morgan's sister. In 1843 Stearns was poor and Morgan had considerable property in his hands, and the first business transactions between them appeared to be a desire upon the part of Morgan to assist Stearns by giving him employment, and a sort of co-partnership existed between them from that time until about 1863. Their operations were such as to include purchasing timber and land in Victory, building mills, manufacturing lumber, and selling the same. Morgan was the active man and furnished all the capital. In some of these operations they were tenants in common, but during the while I find, although there were no articles of agreement between the parties in writing to that effect, that in most of their operations, where there was no special understanding to the contrary, they were to share equally

26

in profit and loss.   During some part of the time between 1851 and 1863 they were connected with other parties as tenants in common.   In 1862 I find that Stearns promised Morgan that all matters between them should be settled; and on the 18th day of February, 1865, the plaintiff and the defendant did make a settlement.   Stearns gave Morgan his two promissory notes, upon which there is due $275.99.

" It was conceded these notes were due and unpaid, by the defendant's counsel, but that the settlement referred to included all of the charges mentioned in the foregoing bill of particulars; whilst the plaintiff claimed, and so testified, that it did not include anything but their private dealings ; that no part of the other charges were included in the settlement, and was now due to him ; whereupon, I find the following facts : That the consideration of these notes was in part a balance found due from Stearns of a private account commencing in 1843 and continuing to about 1858.   I also find the charge of $18.61 was not included in the settlement, as it was kept on a company book, then in possession of the Weeks, at Lyndon, which I have allowed with the interest, $34.32.

" The item of $40.82, board-bill, during the settlement was referred to by the parties, and Stearns claimed he had not been paid that sum for boarding hands while at work on the mill ; the sum was allowed Stearns upon the condition that, if the Weeks had not paid the same, then that sum should stand to the credit of Stearns as it had been and then was allowed.   Upon this hearing, from the testimony of the Weeks, I find Stearns had received his pay ; I therefore allow the same, with interest added, $47.72. The $20 paid Haywood in 1854, and the same paid Goodall, Morgan testified was not included in the settlement, and his statement, connected with the fact that the book and paper contained the subject matter of their settlement, can not be reconciled upon any other theory than as he states it to be.   I therefore allow the sum as stated in the specification, with the interest added, to wit : cash paid William Haywood and interest, $35.60 ; to cash paid Goodall and interest, $20.59.   These several sums as allowed amount to $414.22.

" The first charge in the specification for one-half the amount paid in 1851 to Washburn and Steele for land in Victory, I inferred must have been compromised in the settlement, as I find from the minutes of the same and the books and other evidence, that the land was afterwards sold and Morgan gave credit to Stearns on his book, page 41, $50 for part of Washburn lot.   Although this is less than the sum charged, I am inclined to believe this credit

would be sufficient to take the attention of the parties to the subject and render it more than probable that it was settled, and therefore disallow the same. The remaining sums mentioned in the plaintiff's bill of particulars, amounting to the sum of $1267.62, I allow subject to the credit rendered, less $240—$1027.62, which allowance is to be considered by the court upon the following statement of facts:

" The several sums, mentioned in the specification in prosecuting and defending actions which involved the title and ownership of the timber, mostly taken and standing upon lots No. 49 and 50, in the town of Victory, in which actions Stearns was made a party to the record, both as one of the plaintiffs and also as a defendant with Morgan, were paid out by Morgan.

" In conducting these lawsuits it did not appear that Stearns advised or controlled the same in any manner whatever, but on the contrary, it did appear that Morgan was considered by counsel and witnesses as the principal person in interest. I find, however, that in one or two instances he went with Morgan to see the attorneys engaged by Morgan, and was present during one or two consultations had with them by Morgan, and that he also attended court. I find Morgan kept books of accounts against Stearns and others containing the usual details of debt and credit; but none of these books showed any memorandum charges whatever, relating to these payments, against Stearns. The specifications were made from vouchers taken from witnesses, judgments and other sources: I find from the testimony of Morgan that at the time of the settlement nothing was said about this account, and at no time before except as follows: Sometime in 1862 Morgan and Stearns had a conversation about Stearns settling these expenses. Morgan proposed to Stearns if he would secure to be paid to the Weeks four hundred dollars as his share of these charges, it should be in full for the same. The offer Stearns accepted, but it was not carried into effect for the reason that the security could not be given. This I find to be the only direct acknowledgment of his liability to Morgan for these claims, or promise to pay. The promise above referred to, in 1862, of Stearns, relied upon to remove this statute bar, might only relate to the private dealings between them, which were afterwards settled. Hence I do not find a new promise only as to the four hundred dollars. It did not appear that Morgan made any demand upon Stearns, except at the time last above mentioned, for the payment of these sums. It further appeared that the last two charges in the specification were upon judgment obtained by Messrs. Cahoon against Morgan and Stearns ; that on the trial of

these actions Stearns and Morgan pleaded the statute of limitation, and a new promise was found made by both of them."

*A. J. Willard,* for the plaintiff, maintained that the facts found by the referee are sufficient to show the liability of the defendant in respect to the items of the plaintiff's specification disallowed by the referee; that no homestead exists in a party who has no deed of the same; that Weeks' title was good without any deed from Stearns and his wife; that if there was any homestead, the manner of the sale and the note and money having passed directly to the hands of the husband, made it subject to attachment on the trustee process. *Keyes* v. *Rines*, 37 Vt., 260. That the plaintiff's claim existed prior to the defendant's acquiring a homestead, and for this reason it could be held for said claim. That Evans is liable as trustee for the hay and difference in sheep, because he bought this property with full knowledge that Stearns intended to leave, and defraud Morgan, and with a design to assist him in so doing. Gen. Sts., 313, § 48, § 49; 38 Vt., 122.

*Jona. Ross* and *G. C. & G. W. Cahoon,* for the defendant, trustees and claimant, maintained in respect to the trustees, G. H. & J. M. Weeks, that they were properly discharged and claimant Evans allowed to hold the funds in their hands. The note which evidenced their indebtedness was the property of Mrs. Stearns till purchased by the claimant. She had a homestead interest in the farm, which was an incumbrance resting upon the husband's estate or interest in the farm, and which could not be conveyed without she joined in the deed. It was not necessary that the record title to the farm should be in the defendant in order to give him and her a homestead interest. It is enough that he was equitably the owner of the farm, though his brother held the record title in trust for him. The homestead attaches to the housekeeper's interest in the land and not to the land itself. The language of the act is broad enough to receive this construction, and was intended to furnish a home to the poor man and his family, and should be construed liberally. Its words are, " The homestead of every housekeeper or head of a family consisting,

etc., and used or kept by such housekeeper or head of a family as such homestead," etc. Gen. Sts., 456 § 1.

In the original act, instead of the words "used or kept," the word "occupied" was used, making, not record title, but use or occupation the test to determine whether a homestead exists or not. The court have virtually thus construed the act. *McClary et al.* v. *Bixby, admr.*, 36 Vt., 254.

Inasmuch as the defendant acquired his interest in the farm, and actually occupied and used it for a homestead, prior to the accruing of any of the items which the plaintiff claims to recover in this action, the plaintiff had no right to take the homestead to satisfy his claims, and the defendant, though insolvent, had the right to give his homestead to his wife, and the note can not be reached by the trustee process. *Keyes* v. *Rines*, 37 Vt., 260.

If the defendant and wife's right of homestead was considered doubtful by them and the Messrs. Weeks, yet the refusal of the wife to sign the deed without the $500 could be secured to her, and the unwillingness of the grantees to take the deed without her signature, furnish a sufficient consideration for the note, which the commissioner finds was given *bona fide* to the wife, to enable her to enforce it against the trustees, and make it her property, which she could and did transfer to the claimant.

The opinion of the court was delivered by

PROUT, J. These exceptions present three questions : *First*, as to the disallowance by the referee of the two last items of the plaintiff's account. The relation, out of which the claim to which these items refer originated, was, as the report shows, a "sort of partnership," but whether of such a character as to invest and impose upon the parties, as between themselves, the rights and liabilities of copartners, does not appear. Sharing in the profits and loss of the business is not decisive as between the parties, as this may have been merely an arrangement with a view to compensation for services rendered in the employment of the plaintiff, the amount of which was to be dependent upon the success of the business in which the parties were engaged and interested. This

would be a sort of partnership. It is not, however, claimed that the referee in his finding and conclusion made any mistake except as to the effect he gave the judgment in favor of Mr. Cahoon. We do not think that recovery or adjudication conclusive to the extent claimed for it by the plaintiff, as it does not necessarily show that the subject matter of the litigation involved in those suits, in the prosecution and defence of which Cahoon's claim originated, involved the defendant's interests or property. He may have been so connected with, and participated in those suits, as to make himself liable to the attorney engaged in them, when as between him and the plaintiff there was no liability whatever. If the defendant was only in the employment of the plaintiff and had no other interest, and it does not sufficiently appear that he had, although thus connected with those suits, this might be so. The plaintiff failing, then, upon the facts reported, to establish a liability to pay one half of those expenses to him, without troubling ourselves with the other grounds of defence, the promise relied upon by the plaintiff does not aid him. That arose out of a proposition to the defendant, if he would secure a payment of a part of this claim, it should be in full. This offer the defendant accepted, but nothing was done, and the referee finds that it might have referred to other dealings of the parties, which were afterwards settled.

*Second,* as to the discharge of the trustees, G. H. and J. M. Weeks.

We assume upon the facts reported that the principal defendant acquired his interest in the farm, which he conveyed to the trustees, in 1853 or 1855. It was conveyed to the trustees by the defendant and his wife on the 16th of February, 1865, and the referee finds that they had lived on it ten or twelve years. The record title was in a brother of the defendant and one Spaulding, for purposes of security. It was sold to the trustees for two thousand and fifty dollars, which was paid by applying eight hundred dollars which the defendant was owing the trustees, by paying Spaulding and the defendant's brother seven hundred dollars, the amount of their claims, and by giving a note for five hundred dollars to the defendant's wife, for the amount of which the plaintiff seeks to

charge the trustees in this case. This last note was given for the true balance due on the purchase of the farm, and was *bona fide* designed to secure the value of the homestead interest to the defendant's wife, who refused to convey unless she could have it secured to her. We think upon these facts the defendant had a homestead interest in the property, and that the case, in this respect, is within the reason and spirit of the statute creating it. The essential condition of this right and interest is ownership and occupancy by the husband and family, and the statute applies to an equitable as well as legal ownership ; an incumbered as well as an unincumbered estate. " There is nothing in the nature and policy of the exemption (of the homestead) which makes it any more applicable to" the one than the other, and the act of 1855 (Gen. Sts., 456 §5) as held in *McClary et al.* v. *Bixby admr.*, 36 Vt., 254, " that after the homestead is set out to the widow and minor children, they shall be respectively seized of the same estate in such homestead as that of which such housekeeper or head of family should have died seized, strongly implies that it was the design of the statute to secure a homestead right in lands to which the title of the husband and father was limited and special." This interest of the defendant, being then, as we hold, exempt from attachment, except as to debts that were contracted prior to its acquisition, and this exemption being for the benefit of the family as well as of the husband, and which could not be conveyed unless the wife joined in its conveyance, its value on a sale may be set apart and secured to the wife, especially, in view of the act of 1865 (Session Laws, 25,) which in terms exempts from attachment or trustee process the proceeds of any property sold and conveyed which was at the time of the sale exempt from execution. The question is then as to the time when the plaintiff's claim allowed by the referee accrued, whether before or after the acquisition of the homestead by the defendant, in 1853–5. The allowance of the referee is made up in part of two notes given in February, 1865, which is to be regarded, for the purposes of this question, as the time of the accruing of that portion of the claim. The balance of the allowance consists of an item which accrued in 1858, two items which accrued in 1855, and an

item which accrued in 1854, according to the plaintiff's specification ; all subsequent to the time when the act exempting homesteads from attachment took effect. Now if there is any doubt as to some of these items, there is none as to the notes, and admitting that we could, on the report, separate the plaintiff's claim, upon the question as to the trustees' liability, dates become material, and the time of the accruing of the several claims, in respect to which we are asked to charge them, must appear affirmatively to have been before the defendant acquired the homestead, to enable us to say that they are chargeable as to either. This renders the inquiry as to the intention of the parties in disposing of the note immaterial, as, if the proceeds of the homestead are not subject to attachment, the plaintiff has no legal ground of complaint and can not impeach its validity.

*Third*, as to the liability of the trustee Evans for a mow of hay and the difference in sheep.

The hay was purchased and the sheep exchanged on the 3d of February, and there is nothing in the report to show that at that time the trade as to either was not *bona fide*, or that it was with a view of defrauding or delaying creditors. The note given for the homestead interest was purchased by this trustee afterwards and subsequent to the 16th of February, and all the facts found by the referee relate to what Evans knew of Stearns' intention and purposes, if fraudulent, at a time subsequent to that date. Consequently if this trustee at that time knew all that is claimed, the trade for the hay and sheep was in good faith for aught that appears, and valid as against creditors. If he afterwards discovered or became apprized that his vendor had an illegal purpose in view, he was not bound to throw up the trade, but was at liberty to retain and pay for the property, as he did, before the process in this case was served upon him. It was therefore correctly adjudged that he was not chargeable in respect to this property.

The judgment of the county court is affirmed.